## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELI GOTTESDIENER**, | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | : |
| **INTERNAL REVENUE SERVICE,** | : |
| | : |
| **Defendant.** | : |

## COMPLAINT

Plaintiff, *pro se*, alleges as follows:

### Nature of Action

1.      This is an action under the Freedom of Information Act, 5 U.S.C. § 552 *et seq.*
("FOIA"), as amended, to secure access to requested agency records improperly withheld from
Plaintiff by the Internal Revenue Service ("IRS") and to obtain all other appropriate and
available relief.

### Jurisdiction and Venue

2.      This Court has jurisdiction over this action by virtue of 28 U.S.C. § 1331 because
this is a civil action arising under the laws of the United States.  Specifically, this action is
brought under 5 U.S.C. § 552(a)(4)(B).

3.      Venue is proper here under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

### The Parties

4.      Plaintiff Eli Gottesdiener is an attorney who represents certain participants in
defined benefit pension plans of the "cash balance" variety who dispute that such plans are or

were in compliance with the requirements of the Internal Revenue Code (the "Code") and the

Employee Retirement Income Security Act ("ERISA") during relevant times.

5.    Defendant IRS is an agency of the United States government within the meaning

of 5 U.S.C. § 552(f), a component entity of the Department of the Treasury, which is a

Department of the Executive Branch of the United States Government, with its headquarters in

Washington, D.C., in this judicial district.  Defendant is subject to the requirements of the FOIA,

is in possession and control of the requested records, and is responsible for fulfilling Plaintiff's

FOIA requests.

**Additional Allegations**

**Background to Plaintiff's FOIA request**

6.    A cash balance plan is a defined benefit pension plan in which the participant's

pension benefit is calculated by reference to a notional "account balance" that increases over

time as a result of hypothetical employer contributions and interest credits at a rate specified by

the plan.  *See, e.g.,* IRS Notice 96-8, 1996-1 C.B. 359, 1996 WL 17901 (Feb. 5, 1996).  Because

it is a defined benefit plan and not a defined contribution plan, at least through August 17, 2006

(when Congress enacted certain changes to the law), the "accrued benefit" under a cash balance

plan is never the account balance as such, but rather the annuity commencing at age 65 to which

the participant is entitled under the plan.

7.    On February 5, 1996, the IRS issued IRS Notice 96-8, *supra,* explicitly instructing

cash balance plan sponsors that their plans must provide for and perform a certain specified

actuarial calculation (referred to colloquially and herein as a "whipsaw" calculation) in cashing

out participants who have not yet attained normal retirement age under the plan (typically, age

2

65) and who upon termination of employment with the plan sponsor, request a lump sum distribution of their accrued benefits.

8.     More specifically, Notice 96-8 explains that to ensure actuarial equivalence and protect participants' contractually defined benefits, all cash balance plans, both by their terms as well as in operation, must perform the following three step calculation: (1) project forward to normal retirement age the notional cash balance account of any participant departing the plan prior to age 65 at the plan's interest crediting rate; (2) convert the resultant, projected account balance to an annuity under the plan's annuity conversion factors; and (3) then discount the annuity commencing at age 65 to present value using the statutorily-prescribed interest rate (either the 30-year Treasury bond, or in earlier years, a set of Pension Benefit Guaranty Corporation rates).

9.     As explained in Notice 96-8, whenever the required projection rate is greater than the statutorily-prescribed discount rate (or when the plan's annuity conversion factors are based upon a presumed interest rate more favorable than the discount rate), the actuarial equivalent of the normal retirement benefit, *i.e.,* what the participant is actually owed, will be more than the notional account balance. Unless this higher amount is paid out, Notice 96-8 explains, an impermissible forfeiture has occurred in violation of IRC § 411(a), *see also* ERISA § 203(a), 29 U.S.C. § 1053(a). So too, according to Notice 96-8, the failure to pay the higher lump sum will result in a violation of the requirement that lump sums be no less than the actuarial equivalent of the normal retirement annuity, under IRC § 417(e), *see also* ERISA § 205(g), 29 U.S.C. § 1055(g).

10.    Notwithstanding Notice 96-8 and the clear requirements of the Code and ERISA,

many cash balance plans willfully ignored these requirements.  These plans either ignored their

lawfully written terms or, more typically, attempted to contract around the Code and ERISA and

evade the whipsaw rule by using plan terms to ensure that participants requesting pre-normal

retirement age distributions of their benefits were never paid more than the current balance of the

their notional account balances.  The plans in question committed these violations and/or

persisted in them in the face of numerous court cases and official pronouncements condemning

these practices.  *E.g., Lyons v. Georgia-Pacific Corp.,* 221 F.3d 1235, 1237-38 (11th Cir. 2000);

*Esden v. Bank of Boston,* 229 F.3d 154, 164-173 (2d Cir. 2000); *Berger v. Nazametz*, 157

F.Supp.2d 998 (S.D. Ill. 2001); *PWBA Needs To Improve Oversight of Cash Balance Plan Lump

Sum Distributions,* Report No. 09-02-001-12-121 (March 29, 2002); *Berger v. Xerox Corp.

Retirement Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003).

11.    In 1999, the IRS announced a suspension of the processing of determination letter

applications by employers seeking to convert their existing, traditional defined benefit plans to

cash balance defined benefit plans.  The IRS said it was imposing this "moratorium" pending

study on issues raised in such conversions, including the impact on older employees.  Although

the moratorium by its terms was limited to plans that sought to convert to the cash balance

format, many plans that had already done so and received a determination letter in connection

with such conversions were nevertheless subject to the moratorium which only recently ended.

12.    The moratorium ended as a result of the passage on August 17, 2006 of the

Pension Protection Act of 2006 ("PPA") (P.L. No. 109-280), which, among other things,

4

eliminated the requirement to perform a whipsaw calculation under certain circumstances for distributions occurring after August 17, 2006.

13.    On December 21, 2006, the IRS announced that it was lifting the moratorium in light of the PPA and would begin processing some 1,250 cash balance plan determination letter applications immediately.  *See* IR-2006-193, 2006 WL 3762099 (I.R.S.).  The Service subsequently announced that its goal was to issue determination letters on 90% of the cash balance plans that have been held in abeyance under the moratorium during FY 2007.  However, also on December 21, 2006, the IRS issued IRS Notice 2007-6 (formally issued on January 16, 2007) which makes clear that the Service will insist (as it should) on compliance with Notice 96-8 for pre-August 18, 2006 distributions for all cash balance plans seeking approval of their pending determination letter applications.

**Plaintiff's January 18, 2007 FOIA**

14.    On January 18, 2007, two days after Notice 2007-6 was formally issued, Plaintiff sent the IRS a FOIA request asking for documents relating to all cash balance plans with then-pending determination letter applications that the IRS had identified or would in the review process identify as not satisfying the requirements of Notice 96-8 as to pre-August 18, 2006 distributions.  Plaintiff's request specified that Plaintiff was willing to "pay any required fees associated with this request, in an amount not to exceed $500 (five hundred dollars)," but added "[i]f you expect that the fees may exceed this limit, kindly inform us at the telephone number above and we may agree to a larger fee limit."  Plaintiff asked to be informed "if and when you need a deposit, which we will promptly provide upon request."  Plaintiff also asked that the IRS disclose to him responsive documents "on a rolling basis," *i.e.,* for release as documents became

available for release, rather than a single response once all responsive records had been located and were ready for release.

15.     In a letter which sets forth the date "February 12, 2006," but which was apparently sent on or about February 12, 2007, Joan McClean, an IRS "Disclosure Manager," responded to Plaintiff's request stating that the IRS was unable to respond to Plaintiff's request within the statutorily prescribed time of 20 business days and that a ten-day statutory extension under 5 U.S.C. § 552(a)(6)(B) was required "to search for, collect, and review responsive records from other locations." The letter stated: "Therefore, we have extended the statutory response date (after which you can file suit), to March 7, 2007." The letter said an additional extension beyond the statutory was also required:

> We realize we will be unable to locate and consider releasing the Internal Revenue Service records covered by your request by the expiration of the statutory period. Therefore, we extended the response date to *May 4, 2007,* by which time we reasonably believe we can provide a final response to your request.

(emphasis in the original). Ms. McClean's letter identified Ms. Sharon E. Baker, "Senior Disclosure Specialist," as the person directly responsible for handling Plaintiff's request, which was assigned case number 03-2007-00302.

16.     Plaintiff did not agree to an extension beyond the statutory period. Acting in good faith, he nevertheless refrained from immediately filing suit in reliance on the representations made to him.

17.     After May 4, 2007 came and went with no word from the IRS, on May 9, 2007 and again on May 10, 2007, Plaintiff called Ms. Baker, leaving voicemail messages on her line and with a secretary, Ms. Sandra Smith, explaining the reason for his calls.

18.      On May 11, 2007, Ms. Baker returned Plaintiff's call.  She at first assured
Plaintiff that she would soon have documents responsive to Plaintiff's request from Ms. Cora
Davis, who Ms. Baker identified as the FOIA coordinator for the Employee Plans Division.  But
when Plaintiff asked for specifics, Ms. Baker revised her statement:  she now said she had no
idea if Ms. Davis had actually gathered any responsive documents yet.  When Plaintiff attempted
to find out what then was the basis for Ms. Baker's original statement, Ms. Baker suddenly
disclosed that she had initially sent Plaintiff's request to the wrong office and that all she knew
was that "they" were "working on it."  When Plaintiff asked how Ms. Baker knew that, she did
not respond and said only that she would call Plaintiff with details by May 15, 2007.  She would
not explain why she originally told Plaintiff Ms. Davis already had gathered responsive
documents that she, Ms. Baker, expected to soon have in her possession when, according to her,
that was not the case.

19.      Ms. Baker did not call Plaintiff as she said she would on either May 15 or 16 but
she did on May 16 prepare a letter for Ms. McClean to sign which was sent to Plaintiff that same
day which stated:  "We are continuing to process your request.  If we are unable to respond by
June 29, 2007 we will contact you and inform you of the status of your case. . . . The additional
time is needed for processing your request."

20.      Unbeknownst to Plaintiff at the time, however, the statement that the IRS was
continuing to process Plaintiff's request was not true:  to this day, the IRS has not even begun
processing Plaintiff's request.

21.      On May 18, 2007, Ms. Baker called Plaintiff and informed him that it turned out
that another requester had already asked for what Plaintiff sought several years earlier which was

not possible since Plaintiff sought documents relating to plans whose applications would not be processed subsequent to the January 2007 lifting of the moratorium because they were not Notice 96-8 compliant. Ms. Baker said because responsive records had thus already been located and reviewed, Plaintiff could obtain the records he wanted merely by paying for copying costs: in excess of $3,000.

22.    As Plaintiff attempted to explain to Ms. Baker, she and others at the IRS had misread Plaintiff's request as asking for a copy of the plan documents for all cash balance plans subject to the moratorium, not the far more limited universe of plans with which Plaintiff was and is concerned: only those plans that the Service has specifically identified as not in compliance with Notice 96-8 with respect to pre-PPA distributions.

23.    Notwithstanding Plaintiff's attempted explanation, Ms. Baker was unable or unwilling to distinguish between a request for documents relating to all cash balance plans subject to the moratorium and a request which merely seeks documents relating only to those cash balance plans found to be non-compliant with Notice 96-8.

24.    On May 22, 2007, Plaintiff called Donna Prestia, an actuary (identified by Ms. Baker as an "actuarial") who at the time held the title of Manager, Employee Plans, Actuarial Group 2 and had been identified by Ms. Baker as having been involved in responding to Plaintiff's request. As it happened, Ms. Prestia said she too had thought Plaintiff's request sought a copy of all cash balance plans subject to the moratorium. But once Plaintiff directed her attention to its actual wording and she understood it only sought documents relating to plans found non-compliant with Notice 96-8, Ms. Prestia readily agreed that it should be a relatively simple matter to notify the agents reviewing moratorium plans to flag for possible release to

8

Plaintiff plan documents relating to plans found non-compliant with Notice 96-8. Ms. Prestia

explained to Plaintiff that while there were indeed some 1,250 plans being reviewed in seven (7)

different offices (including Washington, D.C. and Cincinnati), the number of agents assigned to

the task is actually quite small and they hold weekly meetings to compare notes. Ms. Prestia told

Plaintiff that she would contact Ms. Baker, inform her as to what Plaintiff's request actually

sought and discuss with Ms. Baker whether to have each of the 7 offices communicate directly

with Ms. Baker after receiving word of the FOIA whenever they came across a 96-8 non-

compliant plan or whether the 7 offices would communicate with Ms. Baker through Ms. Prestia.

Ms. Prestia apologized to Plaintiff for the Service's failure to carefully read his request and for

confusing it with another, totally different request that had nothing to do with alleged non-

compliance with Notice 96-8.

        25.     On May 23, 2007, Plaintiff called Ms. Baker to learn the results of her

conversation with Ms. Prestia. Ms. Baker said she had spoken to Ms. Prestia but in response to

Plaintiff's question about how she intended to communicate the existence of Plaintiff's FOIA

with the agents in the field, Ms. Baker announced: "I don't deal with that," said that was Ms.

Davis's responsibility, and indicated she did not believe it was her job to even be involved in the

process of communicating Plaintiff's request to agents in the field and coordinating their

responses. Plaintiff therefore asked Ms. Baker to arrange a three-way call with her supervisor

Ms. McClean. Ms. Baker said she would do so but never did.

        26.     On May 29, 2007, Plaintiff therefore called Ms. McClean directly and reviewed

the relevant history with her. Ms. McClean assured Plaintiff that she would speak with Ms.

Baker and make sure that she or Ms. Prestia, in consultation with Plaintiff, sent out a clear

communication accurately capturing the substance of Plaintiff's request to the agents in the field reviewing the moratorium plans that as they do their work and come across Notice 96-8 non-compliant plans, they need to notify the FOIA office and make copies of the relevant documents so they could be reviewed and to the extent possible disclosed to Plaintiff.  None of that, however, ever happened.

27.     Having heard nothing from Ms. Baker, on June 11, 2007, Plaintiff called her, leaving a lengthy voicemail concerning his discussion with Ms. McClean.

28.     On June 13, 2007, Ms. Baker returned Plaintiff's call but avoided answering Plaintiff's questions about when and how agents would be notified of Plaintiff's January request. Instead, she claimed that she still needed to speak to Ms. Prestia to find out how Ms. Prestia wanted to handle the communication to agents in the field.  Ms. Baker promised to call Plaintiff back promptly with the details of what was decided.  She never did.

29.     On June 27, 2007, Ms. Baker prepared a letter for Ms. McClean's signature that was forwarded the same day to Plaintiff.  It stated:  "We are continuing to process your request. If we are unable to respond by September 21, 2007 we will contact you and inform you of the status of your case. . . . The additional time is needed for processing your request."

30.     The statement that the IRS was continuing to process Plaintiff's request was not true.  To this day, the IRS has failed to advise agents reviewing moratorium plans of the existence of Plaintiff's FOIA request.

31.     Having never heard back from Ms. Baker about the discussion she said she would have with Ms. Prestia, in a letter to Ms. McClean dated August 18, 2007, Plaintiff requested that she, Ms. Baker and Ms. Prestia propose a time to discuss the status of Plaintiff's request.  When

Plaintiff did not get a response to his letter, he called Ms. McClean in late August 2007

whereupon he learned that she had been reassigned.

32.     Plaintiff therefore called her replacement, Gregory G. Turner who was now the

Acting Disclosure Manager ultimately responsible for the Plaintiff's request.  Plaintiff left word

for Mr. Turner who did not return his call.  On September 11, 2007, Plaintiff finally reached Mr.

Turner who said he was unfamiliar with Plaintiff's request but promised to look into the matter.

33.     On September 18, 2007, Ms. Baker prepared a letter for Mr. Turner's signature

that was forwarded the same day to Plaintiff.  It stated:  "We are continuing to process your

request.  If we are unable to respond by November 8, 2007 we will contact you and inform you

of the status of your case. . . . The additional time is needed for processing your request."

However, the statement that the IRS was continuing to process Plaintiff's request was not true.

The IRS had not even begun processing Plaintiff's FOIA request.

34.     On September 27, 2007, Plaintiff wrote Mr. Turner to appeal the *de facto* denial

of his request, explaining, as Plaintiff had on the phone, the mishandling of his request and how

it had effectively been ignored.  The substance of Plaintiff's letter was ignored.  Ms. Baker

mistakenly processed it as a new request, and subsequently sent Plaintiff a series of letters (dated

October 24, 2007, November 26, 2007 and January 18, 2008) asking for more time to respond.

IRS's FOIA appeals department separately informed Plaintiff in a letter dated October 24, 2007

that "a lack of a timely response is not a valid reason for filing an administrative appeal."

35.     On November 8, 2007, Ms. Baker prepared a letter for Mr. Turner's signature that

was forwarded the same day to Plaintiff.  It stated:  "We are continuing to process your request.

If we are unable to respond by January 25, 2008 we will contact you and inform you of the status

of your case. . . . The additional time is needed for processing your request."  Again, the statement that the IRS was continuing to process Plaintiff's request was not true.  To this day, the IRS has not even begun processing Plaintiff's request.

36.    On or about November 20, 2007, Ms. Baker prepared a letter for Mr. Turner's signature that was forward to Plaintiff that day concerning Plaintiff's "January 23, 2006" [sic] request "for determination letters" [sic].  In this letter, the IRS stated that "we have estimated the fee to process your request."  The IRS said the estimated fee is $5,000 and letter requests by December 10, 2007a deposit of $250.00 because the estimated fee exceeds the $500.00 fee Plaintiff authorized the IRS to expend without the need to ask for additional authorization.  But regarding when Plaintiff might expect to see responsive documents, the November 20, 2007 letter said only this:  "We have been advised by the Employee Plans Actuary Branch that it will take approximately two to three years to process your request."

37.    The November 20 letter ignored the IRS's obligation to release documents as they become available pursuant to Plaintiff's explicit request to be provided with responsive documents on a rolling basis.  It similarly ignored Plaintiff's conversations with IRS employees who confirmed that responsive documents can be readily identified, copied and reviewed for possible release to Plaintiff if the IRS would but inform the agents reviewing moratorium plans of the existence of Plaintiff's request.

38.    Immediately upon receiving the November 20 letter, Plaintiff placed calls to both Ms. Baker and Mr. Turner, neither of whom answered their phones when Plaintiff called. Plaintiff left voicemails with both stating that Plaintiff of course had no issue with making the required deposit but that he needed to understand the true status of his request and whether or not

the IRS intended to release responsive records as they became available or only two to three years hence.  Neither Mr. Turner nor Ms. Baker returned Plaintiff's calls.

39.     Plaintiff called Mr. Turner again on December 12 and December 19, 2007 leaving additional voicemails, each time taking care to leave Mr. Turner Plaintiff's office and cell phone numbers and email address with the request that if Mr. Turner called when Plaintiff was not available that he, Mr. Turner, suggest days and times they could schedule a call.

40.     Mr. Turner did not return Plaintiff's call until January 7, 2008.  Plaintiff was not available at the time.  Mr. Turner simply left word that he called, despite Plaintiff's repeated request for dates and times a call could be scheduled.

41.     Plaintiff tried on two separate occasions, January 8th and 9th, to reach Mr. Turner before writing him on January 16, 2008.

42.     Mr. Turner responded the next day, January 17, 2008, informing Plaintiff that he would no longer be serving as Acting Manager with responsibility for the processing of Plaintiff's request.

43.     Mr. Turner referred Plaintiff to Marie Twarog with whom Plaintiff spoke on January 16, 2008.  Ms. Twarog said she agreed Plaintiff's request had been mishandled and that she would issue a letter clarifying the IRS's November 20, 2007 letter to Plaintiff.  Plaintiff offered to send the funds requested in that letter to begin processing Plaintiff's request.  Ms. Twarog said that that was unnecessary until a clarifying letter was issued which she said would take one or two days.

44.     Notwithstanding Ms. Twarog's assurances, Plaintiff did not receive (and has never received) a letter correcting or clarifying the IRS's November 20, 2007 letter.

13

45.     Instead, several days later Plaintiff received a letter from Ms. Baker dated January 23, 2008, in which she stated:  "We are continuing to process your request.  If we are unable to respond by March 28, 2008 we will contact you and inform you of the status of your case. . . . The additional time is needed for processing your request."

46.     As previously noted, the statement that the IRS was continuing to process Plaintiff's request was not true because the IRS has never begun processing Plaintiff's request.

47.     On January 31, 2008, Plaintiff wrote Ms. Twarog, noting that she had not contacted Plaintiff or followed-up as she had promised.  But, Plaintiff said, he would hold his larger request in abeyance in exchange for prompt disclosure of responsive records as to nine (9) specific cash balance plans believed to be plans within the scope of his request that the IRS had identified as having Notice 96-8 compliance issues.  Plaintiff enclosed a $500 check along with his letter to ensure that no contention could be raised that Plaintiff had failed to make a requested deposit.

48.     The following day, February 1, 2008, Ms. Twarog responded to Plaintiff's January 31 letter (Plaintiff had also forwarded via email), saying: "I want to do a little more research on your request and how it has been handled.  I will call you on Monday 2-4-2008 with a status report.  I apologize for the delay in getting back to you."

49.     Ms. Twarog did not call Plaintiff on February 4, 2008.  Plaintiff initiated contact on February 6, 2008 but could not get Ms. Twarog on the phone until February 15, 2008, at which time she informed Plaintiff that Ms. Prestia had been reassigned and that her position had been filled by a Mr. Zeigler with whom she said she intended to speak about Plaintiff's requests. She promised to call Plaintiff on February 19.

14

50.     Plaintiff did not hear from Ms. Twarog on February 19, notwithstanding an email he sent her that day saying, "I would appreciate hearing from you today as you said I would."

51.     On March 5, 2008, Plaintiff, through his assistant, contacted Ms. Twarog to inquire into the status of his request.  Ms. Twarog informed Plaintiff, through his assistant, that she did not have a time or cost estimate for responding to it.  She made no reference to the IRS's November 20 letter providing a $5,000, 2-3 year estimate or her failure to send Plaintiff the corrective and clarifying letter she promised weeks earlier.  Ms. Twarog informed Plaintiff's assistant that she wanted to have a conference call with Plaintiff and those responsible for directly responding to his request to discuss it.  When Plaintiff's assistant attempted to schedule such a call, Ms. Twarog demurred, saying her schedule at present was too hectic and that she would get back to Plaintiff.  She never did.

52.     On March 21, 2008, Ms. Baker again wrote to Plaintiff, stating:  "We are continuing to process your request.  If we are unable to respond by May 12, 2008 we will contact you and inform you of the status of your case. . . . The additional time is needed for processing your request."

53.     The statement that the IRS was continuing to process Plaintiff's request was not true:  the IRS has not even begun processing Plaintiff's request.

54.     On March 28, 2008, Plaintiff's assistant managed to get Ms. Twarog on the phone but Ms. Twarog would not or at least did not respond when asked when she was proposing to schedule the conference call she said she wanted to convene.

**Claims**

55.     Plaintiff reasserts and incorporates by reference the foregoing paragraphs.

15

56.    Plaintiff properly requested records within the IRS's control in accordance with the FOIA and has paid and/or offered to pay whatever amount of money it requires to provide Plaintiff with a complete response to the request.

57.    The IRS nevertheless refuses to process Plaintiff's request, failed to respond within the applicable time limits (including reasonable extensions of that time limit) and failed to provide Plaintiff with a single one of the documents which he has requested, none of which can be legitimately withheld under the FOIA and applicable law.

58.    Plaintiff has exhausted its administrative remedies under FOIA § 552(a)(6)(c)(i) and Treas. Reg. § 601.702(c)(12).

59.    Plaintiff is entitled to judicial review under FOIA § 552(a)(4) and Treas. Reg. § 601.702(c)(13).

60.    Plaintiff has a statutory right, pursuant to FOIA § 552(a)(3), to the requested records.  There is no legal basis for Defendant's failure to respond to Plaintiff's request and/or to disclose the requested materials and/or to claim statutory exemptions from disclosure for any requested materials.

### Prayer for Relief

WHEREFORE, Plaintiff prays for all relief to which he is or may be entitled including but not limited to:

A.    A declaratory judgment that Defendant has violated, among other things, the provisions of 5 U.S.C.  § 552(a)(6)(A) and (B), that the IRS's withholding of the records at issue is unlawful, and that the IRS failed to exercise due diligence in responding to the request.

B.      Pursuant to 5 U.S.C. § 552(a)(3), an injunction compelling Defendant to disclose the requested records to Plaintiff forthwith.

C.      Pursuant to 5 U.S.C. § 552(a)(4)(E), an order awarding Plaintiff reasonable attorney's fees and litigation expenses incurred in prosecuting this action.

D.      Pursuant to 5 U.S.C. § 552(a)(4)(F), a declaratory judgment that the circumstances surrounding its failure to release the records raise questions whether the particular agency personnel responsible acted arbitrarily or capriciously with respect to the withholding of the requested records.

E.      An award of costs and reasonable attorney fees as authorized by FOIA, 5 U.S.C. § 552(a)(4)(E) and/or other applicable law.

F.      All such further relief, whether specified herein or not, to which Plaintiff may be entitled.

By:      /s/ Eli Gottesdiener
         Eli Gottesdiener (D.C. Bar No. 420764)
         GOTTESDIENER LAW FIRM, PLLC
         1025 Connecticut Avenue, N.W., Suite 1000
         Washington, D.C. 20036
         Email: eli@gottesdienerlaw.com
         Telephone: (202) 243-1000
         Facsimile: (202) 243-1001

08-618
RCL

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

Eli Gottesdiener

88888

## DEFENDANTS

Internal Revenue Service

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Washington, D.C.
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Washington, D.C.
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Eli Gottesdiener, Gottesdiener Law Firm, PLLC, 1025 Conn. Avenue, #1000, Washington, D.C. 20036. (202) 243-1000.

Case: 1:08-cv-00618
Assigned To : Lamberth, Royce C.
Assign. Date : 4/9/2008
Description: FOIA/Privacy Act

and
.

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government Plaintiff

O 3 Federal Question (U.S. Government Not a Party)

⊙ 2 U.S. Government Defendant

O 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### O A. Antitrust

☐ 410 Antitrust

### O B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### O C. Administrative Agency Review

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### O D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### O E. General Civil (Other)    OR    ◄ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

— O —

| ⬤ **G.** *Habeas Corpus/ 2255* | ⬤ **H.** *Employment Discrimination* | ⊗ **I.** *FOIA/PRIVACY ACT* | ⬤ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ⬤ **K.** *Labor/ERISA (non-employment)* | ⬤ **L.** *Other Civil Rights (non-employment)* | ⬤ **M.** *Contract* | ⬤ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ◯ 2 Removed from State Court   ◯ 3 Remanded from Appellate Court   ◯ 4 Reinstated or Reopened   ◯ 5 Transferred from another district (specify)   ◯ 6 Multi district Litigation   ◯ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

FOIA, 5 U.S.C. Section 552 et seq. Action for failure to provide access to agency records requested in January 2007

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☐   NO ☒ |

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 04/07/2008   SIGNATURE OF ATTORNEY OF RECORD *[signature]*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.